IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENNETH BARRICK,                       )
                                       )
        Defendant-Appellant,           )
                                       )        Civil Action No. 14 CV 9913
    v.                                 )
                                       )        Hon. Charles R. Norgle
STOLAT FINANCIAL, LLC, as Successor )
to Federal Deposit Insurance Corporation, )
as Receiver to Arcola Homestead Savings )
Bank,                                  )
                                       )
        Plaintiff-Appellee.            )

## OPINION AND ORDER

This is an appeal from an adversary proceeding related to the Chapter 7 bankruptcy case

of Dr. Kenneth Barrick ("Debtor"). As Receiver to the defunct Arcola Homestead Savings Bank

("Arcola Bank"), the Federal Deposit Insurance Corporation ("FDIC") filed an adversary

proceeding against Debtor relating to an approximately $600,000 loan he received as a co-signer

in 2008 ("the Loan"). Following a two-day trial, the Bankruptcy Court for the Northern District

of Illinois found that although he did not obtain the Loan through fraudulent means, Debtor

failed to provide a satisfactory explanation as to the loss of the Loan proceeds, as required by 11

U.S.C. § 727(a)(5). Thus, the bankruptcy court denied Debtor's discharge. Debtor now appeals

the bankruptcy court's decision.

## I. BACKGROUND

In January 2012, Debtor filed a Chapter 7 bankruptcy petition in the Northern District of

Illinois. The FDIC filed a multi-count complaint in an adversary proceeding, objecting to

Debtor's discharge of his debts, but only three went to trial. The bankruptcy court found that the

FDIC did not meet its burden to bar Debtor's discharge under 11 U.S.C. § 523(a)(2)(B) and

(a)(4). However, the bankruptcy court found that 11 U.S.C. § 727(a)(5) barred the discharge of Debtor's debts because Debtor did not satisfactorily explain the loss of his assets. Debtor filed a motion to alter or amend the judgment, which the bankruptcy judge denied. This appeal followed.

The record on appeal begins in 2007, when Debtor, an emergency room physician, moved from Louisiana to Chicago. After the move, Debtor met a businessman named Salvatore DiBenedetto ("Mr. DiBenedetto"). They initially met in 2008 through a mutual friend because Debtor needed money for a down payment on a house he wanted to buy in Glen Ellyn, Illinois. Mr. DiBenedetto loaned Debtor "[a]bout $90,000" in the form of a "bridge loan" in an undocumented "handshake transaction." Trial Tr. at 111-12. That transaction marked the beginning of Debtor's and Mr. DiBenedetto's relationship. The two men became friends and began collaborating on several business opportunities in the healthcare industry. Later that year, Debtor's mother, Carrole Collins ("Ms. Collins"), and her companion, Constance White ("Ms. White"), turned to Debtor for financial help because they were behind on their mortgage payments for the house they owned on a 130-acre farm. Additionally, the house needed repairs and they needed supplemental income as they approached their advanced years. Debtor once again solicited Mr. DiBenedetto for a financial solution.

Mr. DiBenedetto proposed a financing option that was too good to pass up. Ms. Collins and Ms. White could borrow money from Arcola Bank, where Mr. DiBenedetto was affiliated, but Debtor had to co-sign because his mother and her companion were not credit-worthy on their own. Mr. DiBenedetto would then invest the proceeds of the Loan in a manner that would not only provide Ms. Collins and Ms. White with enough money to make the necessary repairs on their farm, but they would also enjoy a monthly payment of $1,500 to $,2000. In addition, Mr.

2

DiBenedetto said that Debtor, Ms. Collins, and Ms. White would be free from ever repaying the Loan. Presented with the favorable financing solution, Debtor and the others began making the necessary arrangements to close on the Loan.

There was never a formal closing for the Loan. Instead, Mr. DiBenedetto, accompanied by his wife, brought the closing documents to Debtor's workplace. In an unoccupied room in the hospital's emergency ward, Debtor signed the closing documents and Mr. DiBenedetto's wife served as the notary. Ms. Collins and Ms. White provided signed documentation for the Loan, but they never attended a closing. The proceeds of the Loan paid off one of the two outstanding mortgages on Ms. Collins's farm property. One existing mortgage for approximately $80,000 was paid off, but the second mortgage for approximately $120,000 was not. The remaining net proceeds of the Loan totaled $503,727.18.

On July 23, 2008, Debtor deposited the net proceeds of the Loan into his account at Harris Bank. Debtor also used this account for his personal and business expenditures. Debtor was the only individual named on the bank account, Debtor was the only individual with a debit card linked to the account, and Debtor was the sole signatory on the account.

The bank statements from Debtor's account show that the Loan proceeds were quickly withdrawn. From August 2008 to December 2008, the balance of Debtor's bank account dropped from $518,727.18 to $5,921.14. Then on December 16, 2008, an amount of $497,245.15 was deposited into Debtor's account. This surreptitious deposit came from the funds of another investment client of Mr. DiBenedetto's, Thomas Vann. Despite the second deposit, the Loan proceeds were depleted once again. By the September 8, 2009 bank statement, Debtor's account had reached a negative balance of $45.54. Debtor never filed a police report, never filed an insurance claim, and never notified any authorities to report that his money had been stolen.

3

About nine months later, on June 4, 2010, the Illinois Department of Professional Regulation closed Arcola Bank and named the FDIC as Receiver. Mr. DiBenedetto was subsequently indicted and convicted for fraud in state court.

At Debtor's two-day bankruptcy trial in July of 2014, four witnesses testified: 1) Eric Mertic, an employee from the FDIC; 2) Debtor; 3) Robert Bingham, the agent from the company that provided title insurance on the Loan; and 4) Ms. Collins. Regarding the disappearance of funds from his bank account, Debtor said he was responsible for six transfers to Mr. DiBenedetto totaling $310,000 for investments, but he "never received anything from Mr. DiBenedetto" as to where the money was invested. Trial Tr. at 184. He admitted spending $22,000 on himself. Debtor testified that he did not authorize the withdrawals on the remaining funds that vanished from his account. He did not report the missing funds stolen because he did not look at his bank statements, but if he had, he "would have done something about it." Id. at 181. However, Debtor did admit that he looked at his February 2009 bank statement and noticed the substantial deposit made on December 16, 2008. Debtor also admitted making debit card purchases in March of 2009. Despite the unusual activity leading to a negative balance in Debtor's Harris Bank account, Ms. Collins testified that she continued to receive a monthly stipend and the monthly payments for the Loan continued to be paid until February 2010.

As relevant here, in September 2014, the bankruptcy court found that Debtor failed to adequately explain the disposition of substantial assets. The bankruptcy court relied on In re Mantra, 314 B.R. 723, 730 (Bankr. N.D. Ill. 2004), requiring Debtor to produce some written documentation to corroborate his explanation that the Loan funds were used by Mr. DiBenedetto for investments. The bankruptcy court found that Debtor's testimony that "he had no idea how the funds were being invested or, indeed, whether Mr. DiBenedetto actually invested them at all"

was not a satisfactory explanation that the funds were used for investments. In re Barrick, 518 B.R. 453, 464 (Bankr. N.D. Ill. 2014). The bankruptcy court also rejected Debtor's explanation that the Loan proceeds must have been stolen. Because Debtor was the sole owner of the Harris Bank account and "he never filed a police report, notified any authority, made an insurance claim, or claimed theft losses on his income tax returns," his explanation that the funds were stolen was unsatisfactory. Id. at 465. Thus, the bankruptcy court denied Debtor's discharge pursuant to § 727(a)(5).

Debtor subsequently filed a motion to alter or amend the judgment, which the bankruptcy court denied. Debtor then filed this appeal pursuant to 28 U.S.C. § 158(a). In the interim, Stolat Financial, LLC succeeded FDIC as Receiver and responds to Debtor's arguments on appeal.

## II. DISCUSSION

### A. Standard of Decision

The bankruptcy court's legal conclusions are reviewed de novo. In re Image Worldwide, Ltd., 139 F.3d 574, 576 (7th Cir. 1998). In contrast, the Court reviews for clear error the bankruptcy court's findings of fact upon which a finding of discharge is predicated. Id. This deference to the bankruptcy court's findings of fact are because "questions of credibility are solely for the trier of fact ... who has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." In re D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996) (quoting United States v. Hatchett, 31 F.3d 1411, 1417 (7th Cir. 1994)). The Court will reverse the bankruptcy court's factual findings only when it is "left with the definite and firm conviction that a mistake has been

committed." In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)).

**B. Whether the Bankruptcy Court Erred in Denying Debtor's Discharge Under 11 U.S.C. § 727(a)(5).**

Debtor argues that the bankruptcy court erred by denying his discharge pursuant to 11 U.S.C. § 727(a)(5). Under § 727(a)(5), the bankruptcy court shall grant the debtor's discharge of his debts unless "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). This provision of the Bankruptcy Code is one of several that ensure the debtor's "'fresh start'" is reserved for the "'honest but unfortunate debtor.'" Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)). Typically in an adverse proceeding, the ultimate burden of the preponderance of the evidence rests with the creditor; but under § 727(a)(5), after the creditor meets its initial burden of production—a showing that the debtor once owned the assets he later claims are lost—the burden shifts to the debtor to satisfactorily explain the disposition of the assets. In re Martin, 698 F.2d 883, 887 (7th Cir. 1983); see also Mantra, 314 B.R. at 730.

The bankruptcy court is entrusted with "broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." Martin, 698 F.2d at 886. What constitutes a "satisfactory explanation" is left to the bankruptcy court's discretion, but to meet his burden, the evidence presented by the debtor "'must consist of more than ... vague, indefinite, and uncorroborated' assertions by the debtor." D'Agnese, 86 F.3d at 734. "It is clearly unsatisfactory to grant the debtor a discharge in a case ... where the debtor 'stonewalls' the creditor and refuses to credibly explain to the court his puzzling or suspect transactions. The speculation of the bankruptcy judge or the creditors as to

what may actually have been occurring is not an adequate substitute for a believable explanation by the debtor." Martin, 698 F.2d at 888.

Debtor presents four issues regarding the bankruptcy court's ruling on appeal. First, Debtor argues that the bankruptcy court erred by ruling in favor of the FDIC because § 727(a)(5) does not require him to explain his loss of assets with documentary evidence. Second, Debtor argues that he did submit sufficient documentary evidence to explain the diminution of his assets. Third, Debtor contends that the bankruptcy court failed to take notice of Mr. DiBenedetto's indictment. Lastly, Debtor avers that a denial of discharge under § 727(a)(5) should not apply to him because he never benefitted from the assets.

Turning to Debtor's first argument, a bankruptcy court can deny a debtor's discharge under § 727(a)(5) "[b]ecause the debtor failed to provide any documentation or adequate explanation for the missing assets." D'Agnese, 86 F.3d at 735 (emphasis added). Thus, a debtor's lack of documentary evidence memorializing the loss or disappearance of his assets does not necessarily render his explanation unsatisfactory. As the Seventh Circuit has explained:

> D'Agnese does not set forth a bright line rule that a debtor must [] always present documentation whenever a creditor establishes a loss of assets. Rather, it stands for the proposition that documentation is but one way, albeit a very good way, for a debtor to explain a loss of assets.

In re Hudgens, 149 Fed. App'x 480, 488 (7th Cir. 2005); see also In re Ross, 359 B.R. 690, 701 (Bankr. N.D. Ill. 2007) ("It may be concluded from precedent that documentary evidence may be preferred and in some cases quite necessary, but there is no bright line rule that always requires written corroboration."). Thus, the bankruptcy court's reliance on Mantra for the proposition § 727(a)(5) statutorily requires that Debtor's "oral testimony must be corroborated by some

written documentation" was not a proper conclusion; the statute allows debtors some evidentiary flexibility when explaining a loss of assets. In re Barrick, 518 B.R. at 464.

However, the bankruptcy court's statement that § 727(a)(5) requires the corroboration of written documentation is not a reversible error, because there is no "bright line rule" for determining when a debtor's explanation is unsatisfactory. Hudgens, 149 Fed. App'x at 488. And in this case, the bankruptcy court's ruling was within the "broad power" and deference entrusted to it. Martin, 698 F.2d at 886. In addition to finding that Debtor did not produce documentary evidence of any investments, the bankruptcy court found that Debtor's testimony was not an adequate explanation of the lost assets. The bankruptcy court's finding was not a clear error. This Court agrees that the submission of some type of documentation, i.e. a prospectus report, an account statement, or a form of deposit receipt, is vital to supporting Debtor's explanation that the money was invested. Debtor's assertion that hundreds of thousands of dollars were transferred to Mr. DiBenedetto for investments without any form of documented accounting is too vague and uncorroborated to be satisfactory.

To support his argument that the bankruptcy court erred, Debtor relies on In re Ross, 359 B.R. 690, but his reliance is misplaced. In Ross, the debtor claimed that her car was stolen and her niece corroborated her testimony, but she did not have "any other written documentation corroborating [her] testimony other than the police report." Id. at 701. The bankruptcy court found that the debtor provided enough evidence to support an adequate explanation of her lost asset and granted her a discharge. Id. at 702. Here, however, the circumstances of how the assets went missing and how Debtor reacted to the loss are much different than in Ross. Debtor admits transferring $310,000 out of his account and using another $22,000 for personal expenses. This money was not taken from him unexpectedly. And with regard to the funds that Debtor claims

8

were stolen, he did nothing to retrieve them, despite noticing the suspicious transactions on his

bank statement in February 2009 and his continual use of the debit card on his account into

March. Unlike here, the debtor in Ross could at least produce a police report to document the

loss of her asset. When Debtor was asked by the FDIC at trial why he did not have any

documentation about where the money went once he gave it to Mr. DiBenedetto, he responded:

> Evidently, Mr. DiBenedetto has been indicted in the past, and he's currently
> indicted as well; therefore, we assumed there would be some due diligence on
> your part to evaluate where the money actually went. We were never able to
> obtain information from your organization.

Trial Tr. at 184. At that point in the litigation, the burden was on Debtor to provide a credible

explanation, but he did not. He tried to shift the blame on to Mr. DiBenedetto and the FDIC,

leaving the bankruptcy court to speculate about where the money ultimately went after it left his

Harris Bank account. The bankruptcy court did not find Debtor credible or his explanation

satisfactory. After review of the record, the Court is not left with a definite and firm conviction

that a mistake has been made and it will not overturn the bankruptcy court's factual findings.

Debtor's secondary argument that he provided sufficient documentation to explain the

diminution of the Loan proceeds is unavailing. Specifically, he argues that the bankruptcy

court's decision is erroneous because he "offered documentary evidence of how and why the

money went into the Account, testimony about the understanding of what the money was

supposed to be used for from both himself and Collins, and how the money was used to provide

a stipend for Collins as well as payments on the mortgage for the Property." Br. Appellant

Kenneth Barrick 12 (emphasis added). As the record shows, there was plenty of documentary

evidence that Debtor received the money from the Loan, but that does nothing to explain the loss

or deficiency of assets, as § 727(a)(5) requires. Debtor submitted no documentary evidence or

explanation of where the money went after it went out of his account. Debtor tries to corroborate

his explanation with his mother's testimony, but she did not control the money and she did not testify about where the Loan proceeds went after leaving Debtor's Harris Bank account. Ms. Collin's testimony does not help to corroborate Debtor's explanation of his lost assets.

Next, Debtor argues that the bankruptcy court failed to take notice of Mr. DiBenedetto's indictment. Specifically, he argues: "This Court can and should have taken judicial notice of [Mr. DiBenedetto's] indictment and arrest regarding his activities with Barrick's case." Id. at 15. This argument ignores the bankruptcy court's frequent discussion of Mr. DiBenedetto's indictment in both of its orders. Additionally, Debtor does not cite any legal authority as to why not taking judicial notice would constitute reversible error. Debtor carried the burden to provide more detailed information from Mr. DiBenedetto's criminal case about how the assets were spent, but he did not meet this burden or create the record in his bankruptcy case. The mere fact that Mr. DiBenedetto was indicted did nothing more than leave the bankruptcy court to speculate. Martin, 698 F.2d at 888. The Court rejects this argument as meritless.

Finally, Debtor argues that the application of § 727(a)(5) is inapplicable to him because he was a "mere conduit" that "never possessed" the Loan proceeds, so he never received a benefit. Br. Appellant Kenneth Barrick 15. Debtor does not contend that the FDIC failed to meet its initial burden of showing that Debtor, at one time, owned and controlled the Loan proceeds. Nor could he make this argument, considering the closing documents, his bank statements, and his admission that he deposited the funds into his Harris Bank account. The bankruptcy cases that Debtor cites in support of this argument are neither controlling nor persuasive and do not warrant discussion. The record is clear that Debtor deposited the Loan proceeds into his Harris Bank account, an account in which he was the sole owner. Furthermore, he admitted to taking $22,000 out the account and spending it on himself. His mother may have received a larger

10

contribution of the proceeds than himself, but his argument that he never benefitted from the funds is utterly refuted by the record. The Court finds this argument is disingenuous and without merit.

### III. CONCLUSION

The bankruptcy court's factual finding that Debtor failed to explain satisfactorily the loss of the Loan proceeds was not a clear error leaving this Court with the definite and firm conviction that a mistake has been made. Therefore the bankruptcy court's decision to deny Debtor a discharge pursuant to 11 U.S.C. § 727(a)(5) is AFFIRMED.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: March 20, 2015